UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | EDCV 18-2564 JGB (KKx) | Date | May 29, 2020 |
| Title | *Robert North v. Superior Hauling and Fast Transit, Inc.* | | |

Present: The Honorable   JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

Attorney(s) Present for Plaintiff(s):   Attorney(s) Present for Defendant(s):

None Present   None Present

**Proceedings:**   Order (1) GRANTING Plaintiff's Motion for Preliminary Approval of Class Action Settlement (Dkt. No. 82); and (2) VACATING the June 1, 2020 Hearing (IN CHAMBERS)

Before the Court is Robert North's ("Plaintiff") motion for preliminary approval of class action settlement. ("Motion," Dkt. No. 82.) The Court finds this matter appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-15. After considering the papers filed in support of the matter, the Court GRANTS the Motion and VACATES the hearing scheduled for June 1, 2020.

## I.   BACKGROUND

In October 2017, Plaintiff commenced this action in California Superior Court for the County of San Bernardino. (Dkt. No. 1-2.) The Complaint is styled as a class action suit on behalf of current and former employees of Superior Hauling and Fast Transit, Inc. ("Redbird") who were misclassified as independent contractors and whose rights were violated under California labor law. Id. Redbird removed the case to federal court in December 2018. (Dkt. No. 1.) The third amended complaint is the operative pleading. ("TAC," Dkt. No. 72.) The TAC asserts nine causes of action against Redbird, Intermodal Drayage Services, Inc. ("IDS"), and Dack Lee Ledbetter ("Ledbetter") (collectively "Defendants"): (1) failure to pay wages; (2) failure to reimburse job-related expenses, in violation of California Labor Code § 2802; (3) failure to provide accurate itemized wage statements, in violation of California Labor Code § 226; (4) failure to pay wages due at termination, in violation of California Labor Code § 203; (5) willful misclassification as independent contractors; (6) failure to provide rest periods; (7)

failure to provide meal periods; (8) unfair competition and violation of California's Unfair Competition Law ("UCL"), Cal. Business & Professions Code § 17200 et seq.; and (9) violation of California's Private Attorneys General Act ("PAGA").  (TAC.)

Plaintiff filed the Motion on April 27, 2020.  (Mot.)  In support of the Motion, Plaintiff includes several declarations.  ("Karakalos Declaration," Dkt. No. 82-1 (attaching Exhibits A to C); "Strauss Declaration," Dkt. No. 82-5; "North Declaration," Dkt. No. 85-6.)  The Motion is unopposed.

## II.  LEGAL STANDARD

Approval of a class action settlement requires certification of a settlement class.  La Fleur v. Med. Mgmt. Int'l, Inc., 2014 WL 2967475, at *2–3 (C.D. Cal. June 25, 2014) (internal quotation marks omitted).  A court may certify a class if the plaintiff demonstrates the class meets the requirements of Federal Rules of Civil Procedure 23(a) and at least one of the requirements of Rule 23(b).[1]  See Fed. R. Civ. P. 23; see also Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234 (9th Cir. 1996).  Rule 23(a) contains four prerequisites to class certification: (1) the class must be so numerous that joinder is impracticable; (2) there must be questions of law or fact common to the class; (3) the claims of the class representative must be typical of the other class members; and (4) the representative parties must fairly and adequately protect the interests of the class.  See Fed. R. Civ. P. 23(a).  Rule 23(b) requires one of the following: (1) prosecuting the claims of class members separately would create a risk of inconsistent or prejudicial outcomes; (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive or declaratory relief benefitting the whole class is appropriate; or (3) common questions of law or fact predominate so that a class action is superior to another method of adjudication.  Fed. R. Civ. P. 23(b).

Class action settlements must be approved by the court.  See Fed. R. Civ. P. 23(e).  At the preliminary approval stage, the Court "must make a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms."  Id.  "The settlement need only be potentially fair, as the Court will make a final determination of its adequacy at the hearing on Final Approval."  Acosta v. Trans Union, LLC, 243 F.R.D. 377, 386 (C.D. Cal. 2007) (emphasis in original).  To determine whether a settlement agreement is potentially fair, a court considers the following factors: the strength of the plaintiff's case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.  Staton v. Boeing Co., 327 F.3d 938, 959 (9th Cir. 2003).

---

[1] All references to "Rule" in this Order refer to the Federal Rules of Civil Procedure unless otherwise noted.

### III. CONDITIONAL CERTIFICATION OF THE PROPOSED SETTLEMENT CLASS

The proposed settlement, ("Settlement," Karakalos Decl., Ex. A), defines a settlement class ("Class") comprised of "all current and former drivers for Redbird Carriers and/or IDS who were based out of and worked primarily in the State of California at any time during the Class Period." (Settlement ¶ I(5).) The Court first addresses the Rule 23(a) requirements and then turns to the Rule 23(b) requirements.

#### A. Requirements of Rule 23(a)

**1. Numerosity**

A class satisfies the prerequisite of numerosity if it is so large that joinder of all class members is impracticable. Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998). To be impracticable, joinder must be difficult or inconvenient, but need not be impossible. Keegan v. Am. Honda Motor Co., 284 F.R.D. 504, 522 (C.D. Cal. 2012). There is no numerical cutoff for sufficient numerosity. Id. However, 40 or more members will generally satisfy the numerosity requirement. Id. A plaintiff has the burden to establish that this requirement is satisfied. United Steel, Paper & Forestry, Rubber, Mfg. Energy v. Conoco Phillips Co., 593 F.3d 802, 806 (9th Cir. 2010). Here, Plaintiff estimates there are 268 Class Members, with four distinct Subclasses, with individual members numbering as follows:

   a. 2802 Subclass with an estimated 213 members
   b. PAGA Subclass with an estimated 238 members
   c. Paystub Subclass with an estimated 238 members
   d. Waiting-Time Subclass with an estimated 157 members

(Settlement ¶ VIII(2).) Consequently, the Court finds the numerosity requirement is satisfied.

**2. Commonality**

The commonality requirement is satisfied when plaintiffs assert claims that "depend upon a common contention . . . capable of classwide resolution—which means that a determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011).

Here, common questions exist, such as whether Defendants' uniform policies deprived the Class of wages for non-productive time ("stand-by"), unlawfully deducted expenses from their pay, failed to reimburse all expenses, failed to provide them compliant meal and rest periods, and failed to provide them accurate pay statements. (TAC.) Accordingly, Plaintiff has established commonality.

//
//

### 3. Typicality

"The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiff, and whether other class members have been injured by the same course of conduct." Wolin v. Jaguar Land Rover No. Am., 617 F.3d 1168, 1175 (9th Cir. 2010) (quoting Hanon, 976 F.2d at 508). Because typicality is a permissive standard, the claims of the named plaintiff need not be identical to those of the other class members. Hanlon, 150 F.3d at 1020. Here, each Class Member's claim arises form the same underlying conduct: Defendants' systemwide policies on paying all wages owed, deducting business expenses from wages, providing rest and meal breaks, and providing pay statements. The injury is also similar across the Class. Accordingly, the Court is satisfied that Plaintiff has met the typicality requirement.

### 4. Adequacy

In determining whether a proposed class representative will adequately protect the interests of the class, the court should ask whether the proposed class representative and her counsel have any conflicts of interest with any class member and whether the proposed class representative and her counsel will prosecute the action vigorously on behalf of the class. Johnson v. General Mills, Inc., 275 F.R.D. 282, 288 (C.D. Cal. 2011).

Plaintiff maintains there is no conflict of interest between himself and members of the proposed settlement classes, as his and their interests in this litigation are aligned. (Mot. at 16.) Plaintiff is also represented by competent counsel with experience in class actions who do not have a conflict of interest with the classes. (Strauss Decl. ¶¶ 12-26; Karakalos Decl. ¶¶ 79-88.) Thus, Plaintiff does not have a conflict of interest with the classes that might prevent him from vigorously representing the interests of class members who suffered the alleged violations. Finally, Class Counsel is experienced in litigating wage and hour class actions. (See id.; Strauss Decl. ¶¶ 12-26.) Accordingly, the Court concludes both the class representative and Class Counsel will adequality represent the interests of the proposed classes.

### B. Requirements of Rule 23(b)

"In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 614 (1997). Here, Plaintiff asserts the Settlement satisfies the requirements of Rule 23(b)(3). (Motion at 23-24.)

Rule 23(b)(3) requires (1) issues common to the whole class to predominate over individual issues and (2) that a class action be a superior method of adjudication for the controversy. See Fed. R. Civ. P. 23(b)(3). As to predominance, the "inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Hanlon,

150 F.3d at 1022 (quoting Amchem, 521 U.S. at 623).  "[T]he examination must rest on 'legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement.'" Id. (same).  A class should not be certified if the issues of the case require separate adjudication of each individual class member's claims.  Id.

Here, adjudication by representation is warranted because questions common to the settlement classes represent a significant aspect of the case and can be resolved for all members of each class in a single adjudication.  Specifically, Plaintiff contends that common issues predominate because the claims of both Plaintiff and the proposed classes stem from Defendants' use of common, class-wide policies and procedures and liability can be determined on a class-wide basis. (Mot. at 17.)  The Court is satisfied that the common questions predominate.

A class action must also be superior to other methods of adjudication for resolving the controversy.  Fed. R. Civ. P. 23(b)(3).  To determine superiority, a court's inquiry is guided by the following pertinent factors:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;
(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)–(D).  However, "[confronted] with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial." Amchem, 521 U.S. at 620.

Here, Plaintiff notes the class mechanism provides an effective mechanism for vindicating the claims of class members because many class members lack the resources to shoulder the burden and expense necessary to prosecute their claims. (Mot. at 17.)  Bringing individual claims would prove uneconomic, because litigation costs would dwarf potential recovery. (Id.)  Accordingly, the Court concludes the superiority requirement is satisfied.

//
//
//
//
//
//
//
//

## IV. SETTLEMENT AGREEMENT

### A. Settlement Summary

Below is an overview of the financial terms of the Agreement:

- Gross Settlement Amount: $3,250,000
- Attorneys' fees, not to exceed 30% of gross settlement: $975,000
- Costs and expenses: $25,000
- Service award to class representative: $10,000
- PAGA payment $15,000
- Payment to settlement administrator, estimated not to exceed: $27,500
- Net Settlement Amount: $2,197,500

The $3,250,000 gross settlement amount is non-reversionary, so no amount will be returned to Defendant. (Mot. at 8; Settlement ¶ IV(1).)

### B. Financial Terms

#### 1. Class Members and Allocation of Funds

After all deductions have been made from the Gross Settlement Amount for Administrative Expenses, and PAGA to the LWDA, it is estimated that $2,197,500 will be available as the Net Settlement Amount for disbursement to Class Participants, resulting in an average payment of $8,200 per class member. (Karakalos Decl. ¶ 76.) The Settlement provides for the Net Settlement Amount to be allocated to the estimated 268 Settlement Class Members and four distinct Subclasses including:

a. 2802 Subclass with an estimated 213 members;
b. PAGA Subclass with an estimated 238 members;
c. Paystub Subclass with an estimated 238 members;
d. Waiting-Time Subclass with an estimated 157 members.

(Settlement ¶ VIII(2); Karakalos Decl. ¶ 61.) The Net Settlement Amount shall be allocated and distributed to Class Members who do not timely and properly request exclusion ("Class Participants"), as follows:

a. Approximately $1,125,125, or 51.2% of the Net Settlement Amount shall be allocated and distributed to each Class Participant based on the number of weeks each Settlement Class Member worked during the Class Period, compared to the total number of weeks worked by the Settlement Class Members during the Class Period. The average payout for Class Participants is $4,198.23

b. Approximately $1,072,375, or 48.8% of the Net Settlement Amount shall be allocated and distributed among Class Participants who are part of the Subclasses, which relate to certain causes of action (refer to paragraphs (a) to (d) above)

Plaintiff estimates and allocation of: (a) $879,000 to 2802 Subclass prorated by workweeks (40% of NSA) with an average payout of $4,126.76; (b) $5,000 to the PAGA Subclass prorated by workweeks (25% of the total PAGA Allocation) with an average payout of $21.01; (c) $109,875 to Paystub Subclass prorated by workweeks (5% of the NSA) with an average payout of $461.66; and (d) $78,500 to Waiting-Time Subclass ($500 per member) with an average payout of $500.00.  (Karakalos Decl. ¶ 62.)  Payments will be reported on IRS form 1099 as nonwage income.  (Settlement ¶ IV(4).)

**2. Payment and Distribution of Funds**

The Gross Settlement Fund shall be funded by Defendants in installments, with the first installment being paid on either fifteen days after the Effective Date (as defined in Article I, Section 19 of the Settlement) or December 31, 2020, whichever is earlier.  (Settlement ¶ VIII(6).)  The Settlement Administrator shall then mail, by first-class U.S. mail to the last-known address, the Individual Settlement Amounts within fourteen calendar days after Defendants' deposit of their respective payments and according to the schedule set forth in the Stipulation. (Settlement ¶ VIII(5).)

Any checks issued to Settlement Class Members shall remain valid for 120 days from the date of issuance.  The Parties agree that the Settlement Administrator will issue a check in the amount of any uncashed checks to the Bet Tzedek Legal Services, providing free legal services to low-income individuals.  (Settlement ¶ VIII(7).)

Given the differing financial positions of the corporate Defendants, payments have been spread over four years, through July 15, 2024.  Payments are larger at the outset and decrease in later years.  (Karakalos Decl. ¶ 65.)  Having reviewed financials of Redbird and IDS, Plaintiff's Counsel states that the schedule as drafted is in the best interest of the Class.  (Settlement ¶ VIII(6); Karakalos Decl. ¶ 66.)  Redbird and IDS have agreed to split payment, with Redbird paying $1,625,000 and IDS paying $1,625,000, albeit on different timelines.  (Karakalos Decl. ¶ 67.)  The full amounts allocated to the Waiting-Time Subclass and PAGA Subclass, the Service Fee, and Counsel's Costs will be paid in the first payment with remaining payments based on equitable percentages.  Percentage allocations will be made for the 2802 Subclass, Paystub Subclass, Class Counsel Fees, Settlement Administrator Costs, with the remainder distributed to the Class Participants.  (Karakalos Decl. ¶ 68.)

**3. PAGA Payment**

The Stipulation allots $20,000 to PAGA penalties ("PAGA Allocation").  Seventy-five percent (75%) or $15,000 of the PAGA Allocation shall be paid to the California Labor and

Workforce Development Agency ("LWDA"), and twenty-five percent (25%) or $5,000 of the PAGA Allocation will become part of the Net Settlement Amount distributed to Class Participants. (Stipulation ¶¶ I(28), VIII(2).)

### 4. Class Representatives

Plaintiff shall receive $10,000 in consideration for a general release of all his claims against Defendants. (Settlement ¶ IV(2).) The payment shall be made from the Gross Settlement Amount. If the amount awarded is less than the amount requested, the difference shall become part of the Net Settlement Amount.

### 5. Settlement Administration Costs

The parties have agreed to CPT Group, Inc. ("CPT") as the Settlement Administrator, subject to Court approval. (Settlement ¶ I(37).) CPT is an experienced class administration company that has acted as administrator in numerous wage and hour cases. (Karakalos Decl. ¶ 86; Strauss Decl. ¶ 29.) The Settlement allots an amount not to exceed $27,500 of the Gross Settlement Amount to administer this Settlement, (Settlement ¶ VI(1)), which falls within the range of estimates Class Counsel has received in the past for settlements of similar size and circumstances. (Karakalos Decl. ¶ 90, Ex. C (administrator quote).) CPT will mail notice packets to the class, send reminder postcards, and keep track of opt-out requests and objections to the Settlement. (Mot. at 11.)

### 6. Attorneys' Fees and Costs

Subject to Court approval, Plaintiff's Counsel shall request an award of attorneys' fees in an amount of $975,000 (30% of the Gross Settlement Amount). (Settlement ¶ V(1).) This includes work remaining in documenting the settlement, securing Court approval, ensuring the settlement is fairly administered, and obtaining dismissal of the action. Also, subject to approval, Plaintiff's Counsel shall request a reimbursement from the Gross Settlement Amount for actual litigation costs in an amount not to exceed $25,000.00, which is also included in the Gross Settlement Amount. (Stipulation, ¶ V(1).)

## C. Injunctive Relief

The Agreement does not appear to include any injunctive relief.

## D. Release

In exchange for Defendants' promise to make the payments provided for in the Stipulation, Class Participants settle, compromise, and discharge the Released Claims, including all federal, state, and local statutory claims and common law claims related to hours worked and unpaid wages. (Settlement ¶ XI(1).) Only North has agreed to a general release of all claims. (Settlement ¶ XI(2).)

### E. Notice

Within 10 days after Preliminary Approval, Redbird shall provide CPT with a confidential spreadsheet containing the names, last-known mailing addresses and telephone numbers, last-known e-mail addresses, and the starting and ending dates of contract and/or work for each Settlement Class Member (the "Settlement Class Member Information"). (Mot. at 25.) Within 10 days after receipt of this information, or as soon thereafter as practicable, the Settlement Administrator shall send via first-class U.S. mail to each Settlement Class Member a Class Notice (attached as Exhibit 1 to the Settlement), and I.R.S. Form W-9 ("Notice Packet"). (Id.) The Class Notice shall also contain an easy-to-understand statement alerting the Settlement Class Members that unless he or she submits an Opt-Out Request, the Settlement Class Member will be bound by the release and waiver of all Released Claims against Defendants. (Id.) A reminder postcard will be mailed within 45 days to those Class Members who have not submitted an Opt-Out Request or I.R.S. Form W-9. (Id.)

To request exclusion from the Settlement, a completed Opt-Out Request must be returned via U.S. Mail, fax, or e-mail so that it is received or postmarked on or before 90 calendar days after the Notice Packet was initially mailed (the "Opt-Out Deadline"). (Mot. at 25.) In the event that, prior to the Opt-Out Deadline, any Class Notice mailed to a Settlement Class Member is returned as having been undelivered by the U.S. Postal Service, the Settlement Administrator shall perform a skip trace search and seek an address correction for such Settlement Class Member(s), and a second Notice Packet will be sent to any new or different address obtained. (Id.) If both the first and second Notice Packet mailed to a Settlement Class Member are returned as undeliverable, the Settlement Administrator will e-mail the Class Notice to the Settlement Class Member to any last known email address contained in Defendants' records. (Id.)

### V. PRELIMINARY APPROVAL OF THE SETTLEMENT

"[Rule 23] requires the district court to determine whether a proposed settlement is fundamentally fair, adequate, and reasonable." Hanlon, 150 F.3d at 1026. To determine whether a settlement agreement meets these standards, the court considers a number of factors, including "the strength of the plaintiff's case, the risk, expense, complexity, and likely duration of further litigation, the risk of maintaining class action status throughout trial, the amount offered in settlement, the extent of discovery completed, and the stage of the proceedings, the experience and views of counsel, the presence of a governmental participant, and the reaction of the class members to the proposed settlement." Stanton, 327 F.3d at 959 (internal citations omitted). The settlement may not be a product of collusion among the negotiating parties. In re Mego Fin, Corp. Sec. Litig., 213 F.3d 454, 458 (9th Cir. 2000) (citing Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1290 (9th Cir. 1992)).

"At the preliminary approval stage, some of the factors cannot be fully assessed. Accordingly, a full fairness analysis is unnecessary." Litty v. Merrill Lynch & Co., 2015 WL

4698475, *8 (C.D. Cal. Apr. 27, 2015).  Rather, the court need only decide whether the settlement is potentially fair, Acosta, 243 F.R.D. at 386, in light of the strong judicial policy in favor of settlement of class actions.  Class Plaintiffs, 955 F.2d 1276.  "[T]he court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned."  Hanlon, 15 F.3d at 1027.

### A. Extent of Discovery and Stage of the Proceedings

For a court to approve a proposed settlement, "[t]he parties must . . . have engaged in sufficient investigation of the facts to enable the court to intelligently make an appraisal of the settlement."  Acosta, 243 F.R.D. at 396 (internal quotation marks omitted).  Here, the work by Class Counsel includes drafting pleadings, an unsuccessful first mediation in Los Angeles, removal of the action and further litigation (including discovery and motion practice), a motion for judgment on the pleadings, a motion for leave to amend, a second mediation and settlement in San Francisco, and investigation of tens of thousands of pages of handbooks, personnel files, pay records, independent contractor agreements, and driver logs, as well as the deposition of Plaintiff and of Defendants' Fed. R. Civ. P. 30(b)(6) witness.  (Mot. at 5-8.)  In light of these extensive exchanges between the parties and the advanced level of investigation, the Court finds each side has a clear idea of the strengths and weaknesses of its respective cases, and concludes that the extent of discovery and the stage of proceedings weigh in favor of preliminary approval.

### B. Amount Offered in Settlement

In determining whether the amount offered in settlement is fair, a court compares the settlement amount to the parties' estimates of the maximum amount of damages recoverable in a successful litigation.  In re Mego, 213 F.3d at 459.

The gross settlement amount is $3,250,000.  The total exposure for core claims was evaluated by Plaintiff's Counsel at approximately $37,000,000.  In discounting his exposure analysis, Plaintiff had to consider the realistic potential of (1) proving Defendants were his lawful employer under Dynamex and/or Borello; (2) achieving and maintaining class certification on all claims; and (3) recovering under each of his theories. (Mot. at 24.)  Plaintiff's Counsel also weighed the finances of Redbird Carriers and IDS.  (Karakalos Decl. ¶ 66; Settlement ¶ VIII(6).)

Although the net settlement amount represents a small fraction of the maximum value of this litigation, "[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair." In re Mego, 213 F.3d at 459 (quoting Officers for Justice v. Civil Serv. Comm'n, 688 F.2d 615, 628 (9th Cir. 1982)).  In In re Mego, the Ninth Circuit considered the difficulties in proving the case and

determined the settlement amount, which was one-sixth of the potential recovery, was fair and adequate. Id. Given the difficulties posed to each individual of pursuing his or her claim, the Court finds the settlement amount is potentially fair.

### C. Strength of Case and Risk, Expense, Complexity, and Likely Duration of Litigation

Plaintiff lists several factors weighing in favor of preliminary approval, including the uncertain outcome and the risk of any litigation, the risk of continued litigation in complex actions such as this, as well as the difficulties and delays inherent in such litigation, and the potential difficulty of maintaining the suit as a class action. (Settlement ¶ II(3).) The risk of incurring expense of trial without recovery is high, given that Defendants have denied and continue to deny each and all of the claims alleged, and assert they complied in good faith with California wage and hour laws. (Id. ¶ II(4).)

The Court believes the risk, expense, and likely duration of further litigation weigh in favor of preliminary approval. Without the Settlement, the parties would be required to litigate class certification, as well as the ultimate merits of the case—a process which the Court acknowledges is long and expensive. Overall, these factors weigh in favor of preliminary approval.

### D. Experience and Views of Counsel

"Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation." Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc., 221 F.R.D. 523, 528 (C.D. Cal. 2004) (internal citation and quotation marks omitted). Here, the parties reached settlement after review of their claims and defenses, with the assistance of a mediator. (Mot. at 5-8; Karakalos Decl. ¶¶ 77-88.) The Court finds this factor weighs in favor of preliminary approval.

### E. Collusion Between the Parties

"To determine whether there has been any collusion between the parties, courts must evaluate whether 'fees and relief provisions clearly suggest the possibility that class interests gave way to self interests,' thereby raising the possibility that the settlement agreement is the result of overt misconduct by the negotiators or improper incentives for certain class members at the expense of others." Litty, 2015 WL 4698475, at *10 (quoting Staton, 327 F.3d at 961).

As an initial matter, the Court notes that settlement negotiations were conducted at arms-length. The parties engaged in two mediations with experienced and respected mediators. (Mot. at 5-8, 16.) The use of a mediator experienced in the settlement process tends to establish that the settlement process was not collusive. See, e.g., Satchell v. Fed Ex. Corp., 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007). The Court thus turns to the financial terms of the Settlement.

A court may grant a modest incentive award to class representatives, both as an inducement to participate in the suit and as compensation for the time spent in litigation activities.  See In re Mego, 213 F.3d at 463 (finding the district court did not abuse its discretion in awarding an incentive award to the class representatives).  Plaintiff requests an incentive fee award of $10,000 for his service—including 65 hours and involvement in two mediations—for his risk in connection with being a class representative, and for a more general release of claims.  (Mot. at 15; North Decl. ¶ 19.)  The Court finds the requested service award only potentially reasonable and may not grant it in full should it finally approve the settlement.  For final fairness approval, the Court advises Plaintiff to provide greater detail.  See Clesceri v. Beach City Investigations & Protective Servs., Inc., 2011 WL 320998, at *2, 9, 12 (C.D. Cal. Jan. 27, 2011) (preliminarily approving an incentive award of $3,000 each to the two named plaintiffs when the gross settlement amount was $100,000); Vanwagoner v. Siemens Indus., Inc., 2014 WL 1922731, at *2 (E.D. Cal. May 14, 2014) (preliminarily approving $5,000 as an incentive award when the maximum settlement amount was $225,000).

Generally, courts in the Ninth Circuit find that a benchmark of 25% of the common fund is a reasonable fee award.  Hanlon, 150 F.3d at 1029 ("This circuit has established 25% of the common fund as a benchmark award for attorney fees."); Paul, Johnson, Alston & Hunt v. Graulty, 866 F.3d 258, 272 (9th Cir. 1989) (the 25% benchmark can be adjusted in either direction "to account for any unusual circumstances[,]" but the justification for adjustment must be apparent); Monterrubio v. Best Buy Stores, L.P., 291 F.R.D. 443, 455 (E.D. Cal. 2013) (citing Six (6) Mexican Workers v. Arizona Citrus Growers, 904 F.2d 1301, 1311 (9th Cir. 1990)) ("In applying this method, courts typically set a benchmark of 25% of the fund as a reasonable fee award, and justify any increase or decrease from this amount based on circumstances in the record.").

The Court, in its discretion, may award attorneys' fees in a class action by applying either the lodestar method or the percentage-of-the-fund method.  Fischel v. Equitable Life Assurance Soc'y of U.S., 307 F.3d 997, 1006 (9th Cir. 2002).  The Court determines the lodestar amount by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate.  McGrath v. Cnty. of Nev., 67 F.3d 248, 252 (9th Cir. 1995).  The hourly rates used to calculate the lodestar must be "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."  Blum v. Stenson, 465 U.S. 886, 895 n.11 (1984).  Next, the Court must decide whether to adjust the 'presumptively reasonable' lodestar figure based upon the factors listed in Kerr v. Screen Extras Guild, Inc., 526 F.2d 67, 69–70 (9th Cir. 1975), abrogated on other grounds by City of Burlington v. Dague, 505 U.S. 557 (1992), that have not been subsumed in the lodestar calculation.  See Caudle v. Bristow Optical Co., Inc., 224 F.3d 1014, 1028–29 (9th Cir. 2000).[2]

---

[2] In Kerr, the Ninth Circuit adopted the 12–factor test articulated in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974) which identified the following factors for determining reasonable fees: (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the

Here, Plaintiff's Counsel plans to petition for attorneys' fees not to exceed 30% of the gross settlement amount, or $975,000, and specifies a limit of $25,000 for costs and expenses. (Agreement ¶ VIII(3).) Plaintiff does not offer a lodestar calculation. The Court finds 30% is on the high side of fair, but is potentially reasonable. Without justifying documentation and examples of similar awards, the Court may need to adjust the amount at the final approval stage.

### F. Remaining Factors

In addition to the factors discussed above, the Court may consider the risk of maintaining class action status throughout the trial, the presence of a governmental participant, and the reaction of the class members to the proposed settlement. Staton, 327 F.3d at 959 (internal citations omitted). At this stage, the Court cannot fully analyze the remaining factors. For example, there is no governmental participant in this action. Additionally, the Settlement Class members have yet to receive notice of the Settlement and have not had an opportunity to comment or object to its terms. The Court directs Plaintiff, in the motion for final approval, to provide briefing on these issues.

On balance the factors support preliminary approval of the Agreement. The Agreement is potentially fair, adequate, and reasonable.

## VI.   CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiff's Motion for Preliminary Approval and VACATES the hearing scheduled for June 1, 2020. The Court ORDERS as follows:

1. The Settlement Agreement is preliminarily approved as potentially fair, reasonable, and adequate for members of the Settlement Classes. However, in their motion for final approval, Plaintiff shall address each of the concerns raised above.[3]

2. The following Settlement Class is certified for settlement purposes only:

---

preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases. Kerr, 526 F.2d at 70.

[3] The Court reminds Counsel they must demonstrate compliance with the CAFA notice requirements in their motion for final approval. 28 U.S.C. § 1715(d).

> All current and former drivers for Superior Hauling and Fast Transit, Inc. dba Redbird Carriers (Redbird Carriers) and/or Intermodal Drayage Services, Inc. (IDS) who were based out of and worked primarily in the State of California at any time between October 30, 2013 through the date of entry of this Order.

3. The Court appoints Aris E. Karakalos and Michael A. Strauss of Strauss & Strauss, APC, to serve as counsel on behalf of the Settlement Classes for purposes of settlement only.

4. Plaintiff Robert North is appointed as the representative of the Settlement Class for purposes of settlement only.

5. The Court appoints CPT Group, Inc. ("CPT") as the settlement administrator.

6. The Class Notice forms are approved.

7. The Court authorizes mailing of Notice to the Settlement Class members by U.S. mail and pursuant to the Settlement Agreement.

8. The hearing date for the Final Fairness Hearing is hereby set for **Monday, December 7, 2020** at 9:00 a.m. in Courtroom 1 of the United States District Court for the Central District of California, Eastern Division located at 3470 12th Street, Riverside, California 92501.

**IT IS SO ORDERED.**